**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **TERRY R. DAVIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )     **Case No. 2:18CV64 PLC** |
| **vs.** | ) |
| | ) |
| **ANDREW M. SAUL,**[1] | ) |
| **Commissioner of Social Security** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM AND ORDER**

Plaintiff, Terry R. Davis, seeks review of the decision by Defendant Social Security Commissioner Andrew M. Saul, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

**I.    Procedural History**

On January 29, 2015, Plaintiff, then thirty-eight years old, filed applications for Disability Insurance Benefits and Supplemental Security Income, alleging he became disabled on July 6, 2012 [2] due to "invert[ebral] lumbar disc myelopathy, lumbago, lumbar/thoracic radiculitis, and acquired spondylolisthesis." (Tr. 79, 159, 188) The Social Security Administration ("SSA") denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 91, 98)

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.
[2] Plaintiff later amended the alleged onset date of disability to November 8, 2013, his last day of employment. (Tr. 181)

On July 11, 2017, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 34-64) In a decision dated November 21, 2017, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 8, 2013, through the date of this decision[.]" (Tr. 24) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-4) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Evidence Before the ALJ

### A.  Hearing

The ALJ held a hearing on July 11, 2017. (Tr. 36) Plaintiff testified that he completed twelfth grade and was most recently employed in the shipping department of a Dollar General distribution center in Fulton, Missouri. (Id.) Plaintiff was terminated from that job because he missed a "substantial amount of work" due to back pain, staying home "probably close to a week a month." (Id.) Plaintiff testified that, on the days he missed work, he was "laying [sic] in bed taking prescribed medication to relieve" his pain. (Tr. at 39) Plaintiff stated that two doctors encouraged him to undergo a complete spinal fusion of the L5/S1, but he lost his insurance when he was terminated and could not afford the procedure. (Id.)

Plaintiff testified that, with his current medications, he still felt pain in his lower back and right leg that impacted his ability to walk and stand. (Tr. 41) He explained that the pain limited him to walking one city block or standing for one hour and that, after standing for one hour, he would feel "excruciating pain and numbness" in his right leg and need to lie down. (Tr. 41-42) Plaintiff testified that whether he was primarily sitting, standing, or walking, he needed to lie down for about an hour three or four times through the course of an average day. (Tr. 42-44)

Plaintiff testified that the maximum amount of time he could do anything without lying down was four hours. (Tr. 57) At the time of the hearing, Plaintiff was taking hydrocodone/acetaminophen and gabapentin. (Tr. 40) He was also using a nicotine patch system and had decreased his smoking habit from "about a pack a day" to "about three quarters of a pack a day." (Id.)

Plaintiff testified that he experienced back pain daily. (Tr. 52) He stated that though the pain was always there, sometimes it hurt more than other times. (Id.) The ALJ asked Plaintiff to describe what it felt like when his pain was at its very worst, and Plaintiff responded, "I feel like crying." (Tr. 54) Plaintiff stated that he did not experience the very worst pain every day but estimated that he felt the worst pain "at least three times a week." (Tr. 55-56) He stated that there were times when his back pain was so severe that he was unable to leave the house even to ride in the car. (Tr. 55) For example, the previous week when his friends asked him to go fishing, his back hurt too much to join. (Tr. 56) Plaintiff testified that he went fishing "just a couple times a year."

Plaintiff testified that he lived with his mother and twelve-year-old daughter and stated that he did not "have to do much to take care of" his daughter. (Tr. 44) Plaintiff explained that, while he helped prepare meals, his mother did most of the cooking and his daughter washed the dishes. (Tr. 44-45) Plaintiff testified that he did his own laundry but did not fold the clothes because "it create[d] pain and discomfort" in his back and arms. (Tr. 45) He stated that he had difficulty reaching because it caused pain in his back and he was able to lift five pounds without pain. (Tr. 46) Plaintiff attempted to mow the lawn on a riding mower the previous week but, because of his back pain, he had to stop after fifteen minutes. (Tr. 54) Plaintiff left home about

once a week to go to church, the store, visit with friends, or attend his daughter's school events. (Tr. 51)

A vocational expert testified by telephone. (Tr. 58) The ALJ asked the vocational expert the following:

> [A]ssume a hypothetical individual 40 years of age, a high school education, no relevant past work. Assume the individual will be able to perform sedentary exertional work as that term is defined. The individual would be able to lift or carry ten pounds occasionally, five pounds frequently. Stand and/or walk for two hours of an eight-hour day. Sit for six hours in an eight-hour day. Further assume no climbing. Occasional stooping. No kneeling, crouching or crawling. I'd like you to further assume the hypothetical individual I'm describing could frequently reach. I would like you to further assume the hypothetical individual would need to avoid hazards such as dangerous machinery or unprotected heights.
> …
> [W]ould that hypothetical individual be able to perform any unskilled occupations in the national economy?

(Tr. 60) The vocational expert responded that such a hypothetical individual would be able to perform the duties of three representative occupations: circuit board screener, eyewear assembler, and document preparer. (Id.) The vocational expert stated that his answers were consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 60-61)

The ALJ then asked the vocational expert to consider the same hypothetical individual but assume he "would need to alternate from a sitting to a standing position" for five minutes every hour but could remain on task. (Tr. 61) The vocational expert stated that the three occupations identified would still be appropriate and representative. (Id.) The vocational expert testified it would not change his analysis if the intervals were every thirty minutes instead of sixty. (Tr. 62)

The ALJ asked, "[w]hat if the individual on either hypothetical question had to take additional unscheduled breaks occurring approximately twice per work day? This would be in addition to regularly provided breaks. And they would last for approximately [thirty] minutes."

(Id.) The vocational expert stated that in his opinion such an individual would not be able "to perform any unskilled occupations on a competitive basis." (Id.) Additionally, if the individual were absent on a weekly basis "[t]hat would eliminate all positions." (Id.) Plaintiff's counsel asked the vocational expert if an individual limited to "occasional reaching" would be able to perform the earlier identified jobs. (Tr. 62-63) The vocational expert responded, "no… the reaching is required to [sic] frequent levels…" (Tr. 63)

B.  Medical Records

In July 2012, Plaintiff's primary care physician, Dr. Beahan referred Plaintiff to Dr. Farmer at the Columbia Orthopedic Group for an evaluation of "low back pain radiating into the right leg for the past month." (Tr. 294) Dr. Farmer examined Plaintiff and observed "very guarded range of motion with some right-sided spasms" in the lower back and "a significant amount of irritation to []his lumbar spine." (Id.) Plaintiff  was taking hydrocodone and Flexeril, and he recently finished a Medrol Dosepak but did "not see[] significant improvement." (Id.) Dr. Farmer ordered an MRI, which revealed  an annular tear at the L5-S1 disc with retrolisthesis, and referred Plaintiff to Dr. Parker for a surgical consultation. (Tr. 295)

In August, Dr. Parker assessed Plaintiff with "severe degenerative disc disease at L5-S1 with severe right low back pain but also some right lower extremity radicular complaints." (Tr. 296) Dr. Parker noted that while Plaintiff had a "hard time doing any prolonged standing or walking" his neurological exam was normal and he had a negative straight leg test in both legs. (Id.) Dr. Parker recorded that Plaintiff was "adamantly opposed" to surgery because he had already used five weeks of medical leave and "he cannot be off work any longer, especially since he just got custody of his seven year old daughter." (Id.) Dr. Parker referred Plaintiff to Dr. Meyer for an epidural steroid injection.

Dr. Meyer assessed Plaintiff one week later and administered a lumbar epidural steroid injection. (Tr. 334-38) He noted Plaintiff's gait was "somewhat limping" and recorded a positive straight leg test on the right and negative on the left. (Tr. 336) Dr. Meyer prescribed Vicodin but instructed Plaintiff to "keep the Vicodin usage to a minimum if at all possible." (Tr. 334) When Plaintiff returned to Dr. Parker's office in late August 2012, he reported "having much less leg pain but still has some back pain." (Tr. 297) Dr. Parker prescribed Tramadol. (Id.)

Plaintiff received a repeated epidural steroid injection in September 2012. (Tr. 339) In December 2012, Plaintiff and Dr. Markovitz, another pain doctor in Dr. Meyer's office, discussed alternatives to surgery, and Dr. Markovitz prescribed "physical therapy with TENS unit," added Neurontin, and recommended Plaintiff wear a back brace while working. (Tr. 359)

In December 2012, began physical therapy. (Tr. 276) At the time of his visit Plaintiff was working full time and "manage[d] to work with severe pain at his job in the warehouse of Dollar General Distribution." (Id.) The physical instructed Plaintiff in the "independent performance of a home exercise program" and gave him a TENS unit for pain management. (Tr. 277) Plaintiff was "a little better" in January 2013, but returned the TENS unit because it was not effective. (Tr. 281)

When Plaintiff saw Dr. Markovitz in January 2013, he "continue[d] to be in moderate pain, but stable" and reported that physical therapy "has not been helpful." (Tr. 363) In March, Plaintiff informed Dr. Markovitz "overall…the pain is getting worse." (Tr. 368) Dr. Markovitz reported:

> [H]ad a frank discussion with [Plaintiff] that I commend him on taking actions on his behalf, but on the otherhand [sic] if his pain is not improving, it is not in his best interest to continue on long term Vicodin use. He asked what will I do? I stated he simply may have to decide on surgery… I loaned him the book Defeat Chronic Pain Now.

(Tr. 368-69) In April, Dr. Markovitz said he "admire[d] [Plaintiff]'s perseverance in the face of pain that feels debilitating to him" and encouraged Plaintiff to focus on his exercises. (Tr. 376) In May, Dr. Markovitz observed that Plaintiff "continues to have significant right lower extremity and back pain, and wrote that "epidural steroid injections and P.T., and medications have not offered profound relie[f]." (Tr. 380) Plaintiff informed Dr. Markovitz that he was seeking a second opinion from an orthopedic surgeon. (Id.)

When Plaintiff returned to Dr. Meyer's office in July 2013, he continued to "complain of fairly significant right low back and right lower extremity pain with parethesias into the right lower leg." (Tr. 390) Dr. Meyer administered a palliative right L5-S1 interlaminar epidural steroid injection and right-sided palliative sacroiliac joint injection, which provided "modest, but not significant relief." (Id.) Dr. Meyer noted that Plaintiff had "reached a point where he is willing to accept the fact that he is going to need to undergo a lumbar interbody fusion." (Id.)

In September 2013, Dr. Parker reviewed another MRI and diagnosed Plaintiff with "severe degenerative disc disease at L5-S1 with severe right sided back pain but really no significant evidence of a radiculopathy." (Tr. 300) Dr. Parker wished to schedule a lumbar fusion but noted that "unfortunately," Plaintiff wanted to wait until July 2014 "because of his child support and not wanting to lose his job." (Id.) In October of 2013, Plaintiff informed Dr. Markovitz that he was scheduled for surgery with Dr. Parker in February 2014 and was attempting to secure more approved medical leave. (Tr. 404, 409) Dr. Markowitz urged Plaintiff to cease smoking before surgery.[3] (Id.)

In June 2014, Plaintiff returned to Dr. Beahan's office with "severe" symptoms and requested a referral to pain management. (Tr. 459) A nurse practitioner's examination revealed:

---

[3] Because Plaintiff was terminated and lost his insurance in November 2013, he did not undergo the scheduled surgery. (Tr. 39, 459)

"moderate bilateral diffuse paraspinal tenderness to palpation" in the thoracic, lumbar, sacral region, mildly reduced lumbar spine-flexion extension, and paraspcinal muscle strength and tone within normal limits. (Tr. 460) The nurse practitioner prescribed cyclobenzaprine and referred Plaintiff to pain management specialist, Dr. Lucio. (Tr. 461)

In August 2014, Plaintiff visited Dr. Lucio. (Tr. 411) Dr. Lucio reported the following:

> This is a 34-year-old gentleman[4] who has a long history of degenerative disc disease in his low back. Has had continued pain on his right side and radiating down his right leg. Last year, he received multiple epidural steroid injections which helped his pain but lasted for only about a month at a time. He was subsequently scheduled for surgery but lost his insurance and had to cancel this. At one point, he was on [V]icodin which helped his pain; however, this has been discontinued. His pain is becoming so severe that he is unable to participate in activities of daily living. It begins in his back, down his right hip and leg. He denies any new neurologic deficits.

(Id.) Plaintiff smoked one pack of cigarettes per day and ambulated with a "noticeable limp with severe discomfort" and "guarding," and "grasping on[to] objects in the room for support." (Tr. 412) He found that "all range of motion produce[d] pain" and he confirmed a positive straight leg test on the right and negative on the left. (Id.) Dr. Lucio opined that Plaintiff would not benefit from further epidural steroid injections and prescribed oxycodone. (Tr. 412-13)

In November 2014, Dr. Lucio observed that Plaintiff "ambulates with continued limp however the discomfort is not as severe as it was originally. There is no guarding." (Tr. 414) Range of motion was still painful but improved since the last exam. (Tr. 414-15) Plaintiff informed Dr. Lucio he would undergo surgery "once he obtains insurance." (Tr. 414) Dr. Lucio advised Plaintiff to discontinue Flexeril and take over-the-counter extra-strength Tylenol "when his breakthrough pain became too severe." (Tr. 415)

---

[4] Plaintiff was born on January 26, 1977 and was thirty-seven at the time of the exam. (Tr. 445)

When Plaintiff returned to Dr. Lucio's office in March 2015, his pain was "worsening." (Tr. 417) Dr. Lucio continued Plaintiff's medications and ordered an MRI. (Id.) The MRI showed "advanced disk degeneration L5-S1," and, in April, Dr. Lucio administered an epidural steroid injection. (Tr. 418) In June, Plaintiff reported no relief from the epidural steroid injection. (Tr. 484)

In July 2015, Plaintiff presented to Dr. Reinsel, an orthopedic surgeon, for treatment of his lower back and right lower extremity pain. (Tr. 442) Plaintiff informed Dr. Reinsel that Dr. Lucio "dropped" him because he did not see the surgeon Dr. Lucio recommended and Dr. Beahan was unwilling to continue prescribing the narcotics that Dr. Lucio prescribed. (Id.) Plaintiff stated that his pain level was an "eight out of ten," and Dr. Reinsel observed that Plaintiff's gait was "quite dramatic" and he had "extraordinary difficulty standing up from a chair," "some tenderness on palpation in his lower back," and "pain with axial load of his shoulders in his lower back." (Tr. 443) Dr. Reinsel was unable to assess Plaintiff's motor strength "because of pain." (Id.) Reviewing the March 2015 MRI, Dr. Reinsel wrote: "L5-S1 shows significant disc space collapse and narrowing with some disc bulging on the sagittal image. Spinal canal looks fairly good, although obviously there is some foraminal stenosis." (Id.) Dr. Reinsel believed that fusion surgery "would be a fairly poor choice and unlikely to significant help with his symptoms," but he did not "have any other good treatment recommendations." (Id.) Dr. Reinsel referred Plaintiff back to Dr. Lucio for pain management and Dr. Beahan for "guidance." (Id.)

Plaintiff returned to Dr. Beahan in August 2015 complaining of a cough and shortness of breath. (Tr. 449) Plaintiff informed Dr. Beahan that "he was under house about 2 weeks ago,

he thinks he may have gotten some black mold[.]" (Id.) Dr. Beahan encouraged Plaintiff to stop smoking. (Tr. 452)

In September 2015, Plaintiff followed up with a nurse practitioner at Dr. Beahan's office and complained of a persistent cough and "severe back pain." (Tr. 445) Plaintiff was "grimacing and guarding with ambulation or position changes." (Id.) Plaintiff expressed his desire to stop smoking, and the nurse practitioner prescribed doxycycline, Medrol dose pack, and nicotine patches. (Tr. 448) She also recommended Tylenol as needed and low impact exercise such as swimming or walking. (Id.)

In December 2015, Plaintiff established care with Dr. Tucker at Hannibal Clinic. (Tr. 488) Dr. Tucker reviewed Plaintiff's medical records and performed an examination. (Tr. 488-91) Dr. Tucker observed that Plaintiff had "tenderness over his lumbar musculature at about the L5, S1 area, the L4, L5 area in the interspace between his spinous processes" and a positive straight leg raise test on the right. (Tr. 490) Dr. Tucker noted that Plaintiff was a "current everyday smoker," and advised Plaintiff that "the most important thing he could do…was to quit smoking….[I]t would improve his pain as much as 60% to do so." (Id.)

Dr. Tucker diagnosed Plaintiff with lumbago with right sciatica and intervertebral disc disease of the lumbar spine. (Id.) Plaintiff was taking oxycodone four times per day and had stopped taking cyclobenzaprine because it made him "drowsy and eventually made his legs twitch." (Tr. 489) Dr. Tucker declined to prescribe Oxycodone "as it is a very dependent [sic] inducing medicine" and prescribed hydrocodone/APAP 5/325 and a four-day course of prednisone. (Id.) Plaintiff inquired about exercise and physical therapy, but Dr. Tucker felt there was "no way we can order exercise or therapy as he is very limited in his ability to ambulate." (Id.)

Plaintiff returned to Dr. Tucker in January 2016 and told him that prednisone was a "miracle drug" that "it helped him for about a week and a half to be almost pain free." (Tr. 492) In regard to the hydrocodone, Plaintiff reported that "it works but it also works in a different way and does not rid him of the issue of the pain." (Id.) Noting that Plaintiff still walked with a limp and had a positive straight leg raise on the right, Dr. Tucker refilled Plaintiff's prednisone and hydrocodone. (Tr. 493) Dr. Tucker also "talked explicitly" with Plaintiff about how to quit smoking and reiterated that doing so could reduce his pain by sixty percent. (Tr. 494)

In April 2016, Dr. Tucker described Plaintiff's gait as "not functional." (Tr. 497) Plaintiff was "doing well with his current pain medications" but he "still has pain going down his right leg" and "his right leg is now going numb." (Tr. 496-97) Plaintiff was "starting to stumble and have difficulty walking" and he had "difficulty getting up from a seated position." (Tr. 497) Dr. Tucker refilled Plaintiff's hydrocodone, prescribed gabapentin, advised Plaintiff to stop smoking, and agreed to write him a "disability letter." (Id.) In June, Plaintiff told Dr. Tucker the medication was doing "a fair job of managing his issues." (Tr. 500)

Plaintiff returned to Dr. Tucker's office in July 2016 for a "consultation about disability." (Tr. 504) Dr. Tucker noted that the combination of hydrocodone and gabapentin was doing "a fair job of managing his pain" but clarified that in the long term "pain management d[id] not seem to be a viable option for him" and that the medications were "not stopping the symptoms." (Tr. 504, 508) In addition to back pain, Plaintiff complained of right shoulder pain and "neck pain that goes down both arms…completely encompasses his forearms, hands, and his fingers and all go numb for several minutes after pain shoots from the base of his neck area." (Tr. 505) On examination, Dr. Tucker noted tenderness over the base of the cervical spine and lumbar spine musculature; "traction on either arm seemed to cause worsening of pain in the base of his

neck area"; "positive leg lifting test" on the right leg; and "definite limp on his right side." (Tr. 507-08)

Dr. Tucker completed a medical source statement (MSS). (Id.) In the MSS, Dr. Tucker opined that Plaintiff was able to:

> Occasionally lifting and[/]or carrying in a typical 1/3 of a work day, he tells me with pain he could lift 5 pounds or less… [H]e could probably walk for 30 minutes before having to stop… [H]e can sit continuously for 1 hour before having to shift position… As far as reaching, handling, fingering, or feeling he told me he could do that occasionally, not frequently and again this would aggravate his neck and arm related discomfort and potentially even his lower back… As far as his pain condition and as far as location he has primary tenderness… at the base of his cervical spine and at the base of his lumbar spine… [H]e has traction pain on his arms on both sides and he has leg lifting tests positive on his right side. The conclusions of the above restrictions and activity were based on these findings. Assuming treatment was given for existing pain or fatigue a reclining position for up to 30 minutes 1-3 times a day would not be effective according to the patient's statement. Assuming a supine position for up to 30 minutes 1-3 times a day he told me that would be effective.

(Tr. 508-09) Dr. Tucker concluded that Plaintiff "cannot hold gainful employment with his level of discomfort and inability to work. He also does not have an education that would promote him doing sedentary work rather than labor intensive work." (Tr. 505)

In September 2016, Dr. Tucker saw Plaintiff "to follow up [on] his chronic disabling conditions." (Tr. 512) Examination revealed tenderness of his cervical spine and lumbar musculature, tenderness of the anterior capsule and subacromial area with palpation, limited range of motion in the cervical spine, "very limited" range of motion in the right shoulder, and a positive straight leg lifting test on the right. (Tr. 513) Dr. Tucker diagnosed Plaintiff with lumbago with right sciatica, right shoulder pain, and cervicalgia, and he refilled Plaintiff's hydrocodone. (Id.)

In November, Dr. Tucker diagnosed Plaintiff with "hip dysplasia and sciatica on the right with right foot drop." (Tr. 516) Dr. Tucker counseled Plaintiff on smoking cessation and stated

that he would write a letter and that Plaintiff "would be permanently disabled based on that statement." (Id.) Dr. Tucker's treatment notes did not reference shoulder or upper extremity pain. (Id.)

In December 2016, Plaintiff informed Dr. Tucker that his pain medicine was working well and requested nicotine transdermal patches to help him quit smoking. (Tr. 519) At this visit, Dr. Tucker found that Plaintiff's low back area was tender but there "was no spinous process tenderness," "no sacroiliac tenderness," and "lifting tests on both legs were negative." (Id.) Plaintiff expressed interest in smoking cessation, and Dr. Tucker prescribed nicotine transdermal patches. (Tr. 519-20) Dr. Tucker also refilled Plaintiff's hydrocodone. (Tr. 520)

In April 2017, Plaintiff informed Dr. Tucker that the hydrocodone was "working well," Plaintiff was also taking gabapentin, and "[h]e really has no complaints about that treatment." (Tr. 522) Dr. Tucker observed tenderness in the low back pain and negative straight leg raise tests on both sides. (Tr. 523) Dr. Tucker continued Plaintiff's hydrocodone and gabapentin. (Tr. 523)

### III.    Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Social Security Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy…" 42 U.S.C. § 1382c(a)(3)(B). To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. These steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. (<u>Id.</u>)

## IV.     The ALJ's Determination

The ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 and found that Plaintiff: had not been engaged in substantial gainful activity since November 8, 2013, the alleged onset date of disability; had the severe impairment of degenerative disc disease of the lumbar spine and the non-severe impairments of depression and anxiety; and did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 12-14) The ALJ found that Plaintiff had the RFC to:

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). He can lift or carry ten pounds occasionally and five pounds frequently. He can stand and/or walk for two hours of an eight-hour day. He can do no climbing, occasional stooping, and no kneeling, crouching, or crawling. He can frequently reach. He needs to avoid hazards such as dangerous machinery or unprotected heights. He needs to alternate from a sitting to a standing position, the alternating would be for a brief period of time less than five minutes, he would be able to remain on task, and this would occur at approximately 30-minute intervals.

(Tr. 15)

In determining Plaintiff's RFC, the ALJ compared Plaintiff's subjective allegations to the objective medical evidence of record and found that, while Plaintiff was limited by degenerative

disc disease of the spine, those limitations were not disabling. (Tr. 16) The ALJ explained that Plaintiff's "medically determinable impairments could reasonably be expected to produce the…alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 21) The ALJ determined that "the medical evidence and other evidence d[id] not support allegations of disabling symptoms and limitations." (Id.)

The ALJ acknowledged that Plaintiff's "symptoms would consistently preclude him from meeting the physical demands of warehouse work," but found that his impairments "would likely permit the more reduced range typical of sedentary work." (Id.) The ALJ noted that Plaintiff's condition improved with continued treatment and that, even though Plaintiff's gait was antalgic, no doctor recommended an assistive device for ambulation. (Tr. 22-23) He also emphasized that, despite Dr. Tucker's advice that smoking cessation was the most important thing Plaintiff could do for his pain, Plaintiff continued to smoke throughout the relevant period. (Tr. 21-22) Finally, the ALJ found that Plaintiff engaged in a range of daily activities, which were inconsistent with disability:

> The claimant reported attending his child's ball game and going under his house in his treatment records. In a 2016 function report, the claimant reported that he cares for his 11 year old daughter by making sure she has everything she needs and he does not need reminders to care for personal needs and grooming or to take medications. The claimant also reported that he prepares simple meals, he does chores of laundry, mowing, using a riding mower, taking out the trash, and loading the dishwasher… The claimant also testified that he goes to church, to the store, to visit friends, and to his daughter's school events. He goes fishing twice a year, and he mows the lawn using a riding mower.

(Tr. 22)

The ALJ considered Plaintiff's degenerative disc disease and determined that, with minor accommodations, "he should be able to meet the minimal demands for sedentary work." (Tr. 23)

The ALJ found that Plaintiff was unable to perform any past relevant work but was able to perform the requirements of representative sedentary occupations such as circuit board screener, eye ware assembler, and document preparer. (Tr. 24) Based in part on the testimony of the vocational expert, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work" and Plaintiff was, therefore, not disabled. (Id.)

## V. Standard for Judicial Review

The court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to findings and conclusions" of the Social Security Administration.

Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## VI. Discussion

Plaintiff claims the ALJ's decision is not supported by substantial evidence because the ALJ improperly: (1) discredited Plaintiff's subjective complaints; and (2) discounted the opinions of the treating physician, Dr. Tucker. Commissioner counters that the ALJ properly considered Plaintiff's subjective allegations and Dr. Tucker's medical opinion.

### A. Subjective complaints

Plaintiff argues that, in finding Plaintiff's symptoms were less intense, persistent, and limiting than Plaintiff alleged, the ALJ misrepresented Plaintiff's daily activities. In particular, Plaintiff claims that the ALJ "left out important qualifications" and the fact that Plaintiff received help from his mother and daughter. Commissioner responds that the ALJ properly considered Plaintiff's subjective complaints and articulated the factors that conflicted with Plaintiff's allegations, including his improvement with treatment, non-compliance with treatment, and his daily activities.

For purposes of Social Security analysis, a "symptom" is an individual's own description or statement of his physical or mental impairments(s). SSR 16-3p, 2017 WL 5180304, at *2 (SSA. Oct. 2017). If a claimant makes statements about the intensity, persistence, and limiting effects of his symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. Id. at *8. See also 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain).

When evaluating a claimant's subjective statements about symptoms, the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints," including a

claimant's work history and observations by third parties and physicians regarding: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also SSR 16-3p, at 2017 WL 5180304, at *11.

Here, the ALJ reviewed the objective medical evidence of record and determined it did not support the severity of Plaintiff's alleged symptoms. For example, the ALJ noted that, although treating doctors described Plaintiff's gait as antalgic, "the medical record does not show that he was prescribed or advised to use an assistive device for ambulation by his treatment providers." See Perkins v. Astrue, 648 F.3d 892, 898-899 (8th Cir. 2011) (appropriate for ALJ to consider claimant's conservative treatment and lack of assistive device).

The ALJ explained that, although Dr. Lucio's findings were severe in his initial appointment with Plaintiff in August 2014, Plaintiff "had not been receiving pain management at the time, and Dr. Lucio's subsequent treatment records showed improvement with medication." (Tr. 21) The ALJ also noted that Dr. Lucio subsequently dropped Plaintiff as a patient because Plaintiff "did not go to see the surgeon recommended by Dr. Lucio even for a consultation to discuss treatment options." (Id.)

In December 2015, Dr. Tucker began treating Plaintiff's pain. Dr. Tucker's records supported the ALJ's finding that Plaintiff's examination findings continued to improve with treatment and Plaintiff's pain medication was helpful. (Tr. 21) In January 2016, Plaintiff informed Dr. Tucker that the prednisone was "a miracle drug" and the hydrocodone helped

some. In June, Dr. Tucker noted that Plaintiff's medication was doing "a fair job of managing his issues." In December 2016, Plaintiff informed Dr. Tucker that his pain medication was working well and he had negative straight leg raise tests on both legs. In April 2017, Plaintiff again reported that his medications were working well, and Dr. Tucker again noted negative straight leg raise tests on both legs. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).

Additionally, the ALJ found that Plaintiff's failure to stop smoking, despite his doctors' instructions that it impacted his treatment, detracted from the credibility of his subjective complaints. The record reflects that Dr. Tucker repeatedly advised Plaintiff that smoking cessation "was the most important thing he could do" and would decrease his pain by sixty percent. At the hearing, Plaintiff testified that he was using a nicotine patch and trying to decrease his smoking, but he continued to smoke about three-quarters of a pack per day. (Tr. 40) An ALJ may properly consider a claimant's noncompliance with treatment recommendations, including a failure to quit smoking, when assessing the credibility of his or her subjective complaints. See Adair v. Berryhill, 2:15-CV-77 JMB, 2017 WL 365432, at *9 (E.D. Mo. Jan. 25, 2017) (ALJ properly considered the claimant's failure to stop smoking where doctor repeatedly advised the claimant that "[s]moking increases chronic pain."). See also Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("An ALJ may properly consider the claimant's noncompliance with a treating physicians directions including failing to…quit smoking.") (internal quotation omitted).

Finally, the ALJ found that Plaintiff's activities of daily living undermined his claims of disabling pain. Specifically, the ALJ noted that Plaintiff cared for his daughter, prepared simple

meals, did laundry, mowed the grass using a riding mower, took out the trash, shopped, fished several times a year, and attended church, as well as his daughter's sports events and school functions. (Tr. 22)  An ALJ may discount a claimant's subjective complaints of disabling impairment if they are inconsistent with his activities of daily living.  See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013).

Plaintiff contends that the ALJ mischaracterized his daily activities, because he "left out important qualifications" and failed to mention that Plaintiff lived with his mother, who helped cook and take care of his daughter. [ECF No. 21 at 4] For example, in his function report, Plaintiff wrote that he was able to prepare simple meals but added, "I take it slow and easy. My daughter helps me a lot in the kitchen….I don't lift heavy pots and try to prepare easy meals." (Tr. 266) He also stated that when he mowed the lawn, he had "to stop and rest a lot because it causes me so much pain," and when he shopped, he had "to take breaks a lot." (Tr. 265, 267) At the hearing, Plaintiff explained that he was able to do laundry but could not fold it, his mother did most of the cooking, and his daughter washed the dishes. (Tr. 45) He also stated that, the last time he used the riding mower, he had to stop after fifteen minutes due to pain.

Plaintiff correctly asserts that "a claimant need not prove [he] is bedridden or completely helpless to be found disabled."  Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005). Nonetheless, an ALJ may consider a claimant's activities of daily living inconsistent with his allegations of disabling impairment and consider such activities when judging the credibility of subjective complaints. See McDade, 720 F.3d at 998.  See also Halverson v. Astrue, 600 F.3d 922, 932-33 (8th Cir. 2010) (the ALJ properly considered daily activities in conjunction with other inconsistencies in the record in assessing the credibility of Plaintiff's complaints)

Plaintiff cites evidence that he was limited in his ability to care for his daughter and his household, but the record also includes evidence that he was able to complete such activities. According to his function report, Plaintiff was able to dress and groom himself, prepare simple meals, barbeque once a month, "make sure [his daughter] has everything she needs," mow (with breaks), take out the trash, handle money, fish "a few times a year," "watch movies lying down," and attend church every Sunday and his daughter's sporting events. (Tr. 266-68) Even if Plaintiff sometimes required additional time to complete these activities and he sometimes received assistance with these activities, it was not unreasonable for the ALJ to consider his ability to perform them along with other relevant factors in assessing the credibility of his allegations of pain. See Delmater v. Berryhill, 2:16-CV-70 SPM, 2018 WL 1508868, at *10 (E.D. Mo. March 27, 2018).

The Court finds the ALJ considered Plaintiff's subjective complaints on the basis of the entire record and set out a number of inconsistencies that detracted from the credibility of his allegations of disabling pain. Because the ALJ's determination not to credit Plaintiff's subjective complaints was supported by "good reasons and substantial evidence," the Court defers to his determination. See Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006).

B. Medical opinion evidence

Plaintiff claims that the ALJ erred in assigning only partial weight to the medical opinion of Plaintiff's treating physician, Dr. Tucker. [ECF No. 21] Commissioner counters that the ALJ properly weighed the medical opinion evidence when determining Plaintiff's RFC. [ECF No. 26]

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. (Id.) This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527, 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed, 399 F.3d at 921 (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Tucker began treating Plaintiff in December 2015. At that time, Plaintiff had a positive straight leg test on the right, tenderness over his lumbar musculature, and was "very limited in his ability to ambulate." Dr. Tucker diagnosed Plaintiff with lumbago with right sciatica and intervertebral disk disease of the lumbar spine, switched Plaintiff from oxycodone to hydrocodone, and prescribed prednisone.

When Plaintiff returned the following month, he reported that prednisone was a "miracle drug" and the hydrocodone helped but "in a different way." In April 2016, Plaintiff was "doing well with his current medications," but he still had pain "going down his right leg," his right leg was "going numb," and he was "starting to stumble." Dr. Tucker refilled Plaintiff's

hydrocodone and prescribed gabapentin. In June 2016, Plaintiff informed Dr. Tucker that the medication was doing a "fair job managing his issues."

In July 2016, Dr. Tucker saw Plaintiff for a "consultation about disability." Dr. Tucker noted that the combination of hydrocodone and gabapentin was "doing a fair job of managing his pain," although Plaintiff still felt some symptoms and long-term pain management did not seem to be a "viable option." In these treatment notes, Dr. Tucker recorded, for the first time, Plaintiff's complaints of radiating neck pain and pain and numbness in his arms. Dr. Tucker opined that Plaintiff "deserves disability" and completed an MSS. Based on his conversation with Plaintiff and Plaintiff's self-reported limitations, Dr. Tucker limited Plaintiff to: occasionally lifting/carrying five pounds; walking thirty minutes at a time; sitting for one hour at a time; and occasionally reaching, handling, fingering, or feeling.

In September 2016, Dr. Tucker noted tenderness, a positive straight leg test on the right side, and limited range of motion of the right shoulder and, in November, Dr. Tucker wrote that Plaintiff was permanently disabled. However, Dr. Tucker's progress notes did not preference shoulder or arm symptoms after September 2016 and his December 2016 and April 2017 notes reflected improvement.

In December 2016, Plaintiff reported that his pain medication was working well and straight leg raise tests on both sides were negative. At his last recorded appointment with Dr. Tucker in April 2017, Plaintiff stated that his medication was "working well" and he "really has no complaints about that treatment." Plaintiff straight leg tests were negative on both legs.

The ALJ thoroughly reviewed Dr. Tucker's treatment notes, evaluations, and MSS and explained his reason for assigning Dr. Tucker's opinion "partial weight." The ALJ acknowledged that Dr. Tucker was "an acceptable medical source with a treating relationship with the claimant"

and the "basic strength limitations he provided are near the sedentary range." (Tr. 22) However, the ALJ found that Dr. Tucker's treatment notes and the medical record as a whole did not support the extreme functional limitations he identified in the MSS.

Based on the Court's review of the record, substantial evidence supported the ALJ's evaluation of Dr. Tucker's medical opinions. First, the ALJ discredited Dr. Tucker's lift/carry and manipulative limitations, because they were based on Plaintiff's recitation of his subjective limitations. Dr. Tucker's treatment notes corresponding with the date of the MSS reveal that he completed the MSS on the basis of Plaintiff's self-reported limitations. Also notable was the fact that Plaintiff's first complaints about arm and shoulder symptoms arose at that appointment. "An ALJ may award less weight to a medical opinion when that opinion appears to be largely based on the plaintiff's subjective complaints." Sears v. Berryhill, No. 6:16-CV-3483-CV-RK, 2017 WL 6343804, at *1 (W.D. Mo. Dec. 12, 2017) (citing Gonzales, 465 F.3d at 895).

The ALJ also discredited Dr. Tucker's standing and/or walking and postural limitations, as well as the requirement that Plaintiff assume the supine position one to three times per day because they were "inconsistent with Dr. Tucker's clinical observations that the claimant's examination improved with continued treatment." (Tr. 22) As previously discussed, Dr. Tucker's most recent treatment notes stated that Plaintiff's medications were effectively controlling his pain. Additionally, he had, for the first time in years, negative straight leg raise tests on both sides. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (quoting Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)).

In regard to Dr. Tucker's statements that Plaintiff was "unable to have gainful employment," the ALJ stated: "[A]n opinion on disability is reserved to the Commissioner." (Tr.

22) "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

Plaintiff again challenges the ALJ's reliance on an "incomplete picture of" Plaintiff's activities – such as preparing simple meals, using a riding mower, shopping, and fishing – to discredit Dr. Tucker's medical opinion. However, Plaintiff's activities of daily living were one of several factors the ALJ considered when assessing Dr. Tucker's opinion. Moreover, "[a]n ALJ may discount a treating physician's opinion when it is inconsistent with a plaintiff's activities of daily living." Johnson v. Berryhill, No. 4:16-CV-1114-NCC, 2017 WL 4280674, at *4 (E.D. Mo. Sept. 27, 2017).

Importantly, the ALJ did not completely discount Dr. Tucker's opinion, but rather assigned it "partial weight." Although Dr. Tucker limited Plaintiff to occasionally lifting/carrying five pounds, the ALJ determined he was capable of frequently lifting/carrying five pounds and occasionally lifting/carrying ten pounds. The ALJ rejected Dr. Tucker's statement, which he based on Plaintiff's subjective report, that Plaintiff could occasionally reach, handle, finger or feel, but nonetheless limited Plaintiff with respect to frequent reaching. Finally, as the ALJ noted in his decision, he included greater limitations on Plaintiff's sitting than Dr. Tucker. Although Dr. Tucker opined that Plaintiff could sit for an hour at a time, the ALJ included in Plaintiff's RFC a requirement that Plaintiff "alternate from a sitting to a standing position…at approximately thirty-minute intervals." Upon review of the record, the Court finds that the ALJ properly evaluated Plaintiff's and provided "good reasons" for assigning it partial weight.

**VII.    Conclusion**

For the reasons discussed above, the court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE


Dated this 21st day of August, 2019